UNITED STATES DISTRICT COURT
THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| QUINN CONSTRUCTION, INC., : <br> : <br> Plaintiff, : <br> : <br> v. : <br> : <br> FIDELITY & DEPOSIT : <br> COMPANY OF MARYLAND : <br> d/b/a ZURICH NORTH AMERICAN, : <br> : <br> and : <br> : <br> UNITED STATES FIDELITY : <br> AND GUARANTY : <br> COMPANY d/b/a : <br> ST. PAUL TRAVELERS, : <br> : <br> and : <br> : <br> FEDERAL INSURANCE COMPANY : <br> d/b/a CHUBB GROUP OF : <br> INSURANCE COMPANIES, : <br> : <br> Defendants. : | Civil Action No. 06-591 (FLW) <br><br> **OPINION** |

**WOLFSON, United States District Judge:**

Plaintiff Quinn Construction, Inc. ("Quinn") was party to a subcontract on a library construction project at the College of New Jersey ("the College") with Hunt Construction Group, Inc. ("Hunt"), the general contractor on the project. The Sureties[1], through payment bonds secured by Hunt, are jointly and severally liable to Quinn for all work performed under its subcontract with Hunt. Quinn alleges that Hunt has failed to pay it for its work on that project,

---

[1.] Defendants Fidelity & Deposit Company of Maryland d/b/a Zurich North America, United States Fidelity and Guaranty Company d/b/a St. Paul Travelers, and Federal Insurance Company d/b/a Chubb Group of Insurance Companies (collectively "the Sureties").

and accordingly, Quinn brings this action against the Sureties to collect certain payments it alleges are due it on the project. Now, more than two-and-a-half years after the commencement of this suit, the Sureties move the Court to summarily dismiss the Complaint in its entirety. The Sureties claim that summary judgment is proper because Quinn filed suit prematurely, failing to wait 90 days after giving notice to the Sureties before bringing suit, as required by New Jersey's Public Works Lien and Bond Law, N.J.S.A. 2A:44-143, et seq. ("Bond Act"). For the reasons that follow, the Sureties' motion is denied.

**I. Factual Background**

Hunt, a construction firm, entered into a Prime Contract with the College on August 11, 2003, in the amount of $22,750,000.00 for construction of a library. Declaration of Andrew Kobayashi, ¶ 2 ("Kobayashi Decl."). The Prime Contract incorporated multiple documents into its conditions, including the Volume I Project Manual dated May 30, 2003 ("Project Manual"). See Reply Declaration of Andrew Kobayashi, ¶ 2 ("Kobayashi Reply Decl."). The Project Manual expressly requires that payment and performance bonds be furnished by the contractor and that all such bonds "conform in all respects to the requirement and language of" the Bond Act. Kobayashi Reply Decl., Ex. A (the Project Manual) at p. 24. Specifically, Article IB 7 of Section 5 of the Project Manual required Hunt to secure payment and performance bonds as security for payments to all parties and persons performing labor and providing materials for the library project, see Id., and that all such bonds "conform in all respects to the requirement and language of N.J.S.A. § 2A:44-143 to 147." See Id.; Kobayashi Reply Decl. ¶ 3. The general conditions of the Project Manual also required all such bonds to be legally effective on the date the contract was signed and accordingly, Hunt secured bonds from the Sureties, effective on July 31, 2003.

Kobayashi Decl., Ex. A at p. 1 (bond documents). The Bonds secured by Hunt from the Sureties stated that they were given in compliance with New Jersey's State College Contracts Law, N.J.S.A. 18A:64-68 ("the College Contracts Law"). Id.

Hunt executed a subcontract with Quinn on December 2, 2003, wherein Quinn agreed to furnish labor and materials for concrete construction on the project. Kobayashi Decl. ¶ 4. The subcontract between Hunt and Quinn provided that the Prime Contract and the subcontract "are intended to supplement and complement each other and shall, where possible, be so interpreted." Certification of Carter N. Williamson, Ex. 4 (the subcontract). However, if any term of the subcontract "irreconcilably conflicts" with the Prime Contract, then that provision granting greater rights to Hunt or greater obligations to Quinn would govern. Id. Quinn's last day of work on the project was in 2005. Kobayashi Decl. ¶ 8.

On November 8, 2005, Quinn sent to the Sureties notice of its claim against Hunt's payment bond and then filed suit against the Sureties 85 days later on February 1, 2006. The Sureties submitted their Answers to Quinn's Complaint in April of 2006. Now, the Sureties move for Summary Judgment against Quinn on the ground that suit was prematurely filed in volation of the Bond Act.

## II. Discussion

### A. Standard of Review

"Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law." Pearson v. Component Tech. Corp., 247 F.3d 471, 482 n.1 (3d Cir. 2001) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)); accord Fed. R. Civ. P. 56(c).

For an issue to be genuine, there must be "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party." Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Curley v. Klem, 298 F.3d 271, 276-77 (3d Cir. 2002). For a fact to be material, it must have the ability to "affect the outcome of the suit under governing law." Kaucher, 455 F.3d at 423. Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp., 477 U.S. at 323. Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. Id.; Maidenbaum v. Bally's Park Place, Inc., 870 F. Supp. 1254, 1258 (D.N.J. 1994). Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. Anderson, 477 U.S. at 256-57. "A nonmoving party may not 'rest upon mere allegations, general denials or . . . vague statements . . . .'" Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs, 982 F.2d 884, 890 (3d Cir. 1992) (quoting Quiroga v. Hasbro, Inc., 934 F.2d 497, 500 (3d Cir. 1991)). Moreover, the non-moving party must present "more than a scintilla of evidence showing that there is a genuine issue for trial." Woloszyn v. County of Lawrence, 396 F.3d 314, 319 (3d Cir. 2005). Indeed, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion,

4

against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at 322.

Moreover, in deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. Credibility determinations are the province of the fact finder. Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

The Sureties move to dismiss Quinn's Complaint on the following grounds: New Jersey's Bond Act requires that a contractor wait 90 days to file suit after giving notice to the party against whom it asserts a claim. See N.J.S.A. 2A:44-145. The Prime Contract between Hunt and the College and the subcontract between Quinn and Hunt incorporated the provisions of the Bond Act into their general conditions. Quinn filed suit only 85 days after giving notice to the Sureties. As such, the Sureties assert that Quinn's claims fail as a matter of law, as they are prematurely filed in contravention of the Bond Act.

In response, Quinn offers various arguments to demonstrate that the Bond Act has no application to this case. In particular, Quinn argues that the bonds secured by Hunt on the construction project at issue clearly state that they are issued pursuant to the College Contracts Law. Because the College Contracts Law does not require a 90 day waiting period, its claims are not barred. Quinn argues, alternatively, that even if the Bond Act does apply, policy considerations and equitable principles should bar dismissal of its claims. The Court now turns to Quinn's contentions.

### B. The Parties are obligated by the provisions of the Bond Act.

The Sureties move to dismiss Quinn's claims against them based on Quinn's failure to fulfill the statutory requirements of the Bond Act for bringing its claims. Quinn argues that the Bond Act does not apply to the bonds secured by Hunt from the Sureties, and therefore, its claim is not barred by its failure to wait 90 days. For support, Quinn points to the bonds secured from the Sureties by Hunt which state on the forms that they are issued pursuant to the provisions of the College Contracts Law. See Kobayashi Decl. Ex. A ("bond documents") at p. 1. Quinn argues, therefore, that the 90 day waiting period of the Bond Act does not apply to the bonds furnished on this project. Specifically, Quinn asserts that the Bond Act only applies to contracts entered into by the State and certain other entities described within that statute, while the College Contracts Law grants independent contracting authority to state colleges. The statutes, therefore, are not intended to work with one another, as evidenced by (1) certain provisions and sections of each statute which would be redundant if intended to work together; and (2) certain contradictory provisions - including the College Contracts Law's permissive bonding provisions and the Bond Act's mandatory bonding requirement - which represent distinctive statutory schemes. Quinn argues that because the College Contracts Law and the Bond Act are distinct from one another, "the Sureties must either show that [the Bond Act's 90-day waiting period provision] somehow is incorporated into the statutory scheme for the State College Contracts Law or that the Sureties in someway incorporated the provisions into their Payment Bond." Pl.'s Br. at 8.

While Quinn is certainly correct that the College Contracts Law and the Bond Act are distinct statutes which function separately from one another, Quinn has failed to recognize that

6

the College, pursuant to the discretion granted it under the College Contracts Law, expressly adopted the Bond Act's requirements under N.J.S.A. 2A:44-145, the provision which sets forth the 90-day waiting period.

Indeed, the College had the discretion do so under the College Contracts Law, which provides that:

> the State college may require that the successful bidder provide a surety company bond or other security acceptable to the State college:
> (1)   For the faithful performance of all provisions of the advertisement for bids, the specifications and any other documents issued to bidders or a repair or maintenance bond; and
> (2)   <u>In a form which may be required in the specifications or other documents issued to bidders</u>.

N.J.S.A. 18A:64-68 (emphasis added). In other words, the College had discretion to require not only that Hunt secure payment bonds, but also to determine the procedures and mechanisms by which Hunt did so. The College explicitly chose to require Hunt to secure bonds pursuant to the requirements of the Bond Act. In fact, the Project Manual, specifically incorporated into the Prime Contract, required that all bonds secured on the project "conform in all respects to the requirement and language of N.J.S.A. § 2A:44-143 to 147." [2] See Project Manual at p. 24. Put differently, while the bonds secured by Hunt were issued pursuant to the College Contracts Law, that law gives the College discretion to specify if and how bonds are secured. Exercising its statutory discretion, the College chose to adopt the form and requirements of the Bond Act, including section 145. As such, the statutory 90 day waiting period of the Bond Act applied to

---

[2.] Quinn does not dispute that, pursuant to its discretion, the College chose to adopt certain provisions of the Bond Act. Crucially, however, Quinn mistakenly asserts that the contract only binds the parties to the requirements of N.J.S.A. 2A:44-147. This proves fatal to its argument, as the Project Manual clearly binds the parties to sections 143-147, which, of course, include section 145.

the construction project. Indeed, the subcontract between Hunt and Quinn adopted the same provisions of the Prime Contract, and consequently, Quinn was required to abide by the 90 day requirement.[3]

### C. Interpretation of the Bond Act

Notwithstanding the requirements of the Bond Act, Quinn directs the Court to the Federal Miller Act, which New Jersey courts have considered as the analogue of the Bond Act. See Dial Block Co., Inc. v. Mastro Masonry Contractors, 374 N.J. Super. 13, 21 (App. Div. 2004). Quinn posits that this Court should follow the lead of federal courts that have ruled on suits filed prematurely under the Miller Act. Particularly, because of the Miller Act's remedial nature protecting materialmen, like Quinn, federal courts have not hesitated, in certain circumstances, to allow premature claims to survive even though the plain language of the Act sets forth a 90-day waiting period. Since New Jersey courts have not squarely dealt with this issue, for support, Quinn relies primarily on Security Ins. Co. of New Haven, Conn. v. U.S. ex rel. Haydis, 338 F.2d 444 (9th Cir. 1964).

In Haydis, the Ninth Circuit permitted a supplemental pleading filed after the expiration of the one-year statute of limitations to relate back to a previously filed complaint. Id. at 449. There, the plaintiff, a supplier of materials to the contractor, had filed his complaint prematurely in contravention of the Miller Act, 40 U.S.C. § 270b(a), which requires the plaintiff to wait ninety days after the last day in which labor or materials were supplied before he can sue on the

---

[3.] Further, Quinn's reliance on the language of the Bond itself is misplaced. Though the Bonds do assert that they are issued pursuant to the College Contracts Law, these Bonds were secured on July 31, 2003. The Prime Contract, which expressly incorporates the Bond Act, was not signed until August 11, 2003 and Quinn did not sign the subcontract until December 2, 2003. Therefore, Quinn should have been on notice that the contractual provisions adopted sections 143-147 of the Bond Act, pursuant to the College's discretion under the College Contracts Law.

payment bond. Id. at 445. The plaintiff had filed his complaint before the ninety-day period had expired. Id. Over one year later, on the day set for trial, the defendant moved to dismiss the complaint because of its premature filing. In response, the plaintiff filed a supplemental pleading alleging that by then the required ninety-day period had elapsed. Id. The defendant argued that the case should be dismissed regardless because (1) the original complaint was premature; (2) the supplemental pleading was filed after the statute of limitations had expired and should not relate back; and (3) even if the supplemental pleading did relate back, it had to relate back to the time the original complaint was filed -- a time when the plaintiff could not have filed his complaint under section 270b(a). Id. at 446. The court refused to dismiss the case, despite the clear and unambiguous language of the Miller Act. Instead, citing both Fed. R. Civ. P. 15(c) and 15(d), it held that the supplemental pleading could relate back to the original complaint. Id. at 449. The court reasoned that both of the complaints arose out of the same transaction - the supply of materials to the contractor for the federal project. The supplemental complaint was a copy of the original complaint but with the additional allegation that the ninety-day waiting period had elapsed. The court allowed the supplemental pleading for equitable reasons, where defendant had notice of the case and was aware that the original complaint was filed prematurely yet he waited over a year to object. Id. at 448-49; see United States use of Wulff v. CMA, Inc., 890 F.2d 1070, 1073 (9th Cir. 1989).

The First Circuit, in United States ex rel. Capitol Electric Supply Co., Inc. v. C.J. Electrical Contractors, Inc., 535 F.2d 1326 (1st Cir. 1976), expressly adopted the Haydis court's reasoning. The court added that the underlying purpose of the Miller Act would be ill-served by denying relief to the plaintiff "solely because its action was premature." Capitol Electric 535

F.2d at 1330. In that case, Capitol Electric, a subcontractor on a government contract, filed suit against C.J. Electrical, the prime contractor, for failure to pay Capitol on that contract. Id. at 1327. Although there was a factual dispute concerning whether or not Capitol had even filed prematurely, the court proceeded on the assumption that it had. Id. at 1329. Nevertheless, the court, citing Haydis, found that Capitol could file a corrective pleading which would relate back to its original complaint for the purposes of conforming to the Miller Act's time requirements. Id. at 1329-30. The court further noted that in the circumstances presented in that case, there was no prejudice to defendant.

In the same spirit, New Jersey courts have held that the Bond Act should be interpreted to effectuate its remedial nature of protecting material suppliers. Dial Block, 374 N.J. Super. at 20; see Velez v. Wilkerson Elec. Servs., Inc., 351 N.J. Super. 2, 8 (App. Div. 2002). Cases interpreting the Miller Act provide a guide for New Jersey courts when construing the Bond Act. Dial Block, 374 N.J. Super at 21; Unadilla Silo Co., Inc. v. Hess Bros., Inc., 123 N.J. 268, 282 (1991) (referring to Miller Act as "the federal analogue of our Bond Act."). See also Morris County Indus. Park v. Thomas Nicol Co., 35 N.J. 522, 531 (1961) (referring to Miller Act as a "comparable federal statute"); W. Bank Oil, Inc. v. Hartford Acc. & Indem. Co., 205 N.J. Super. 56, 63 (App. Div. 1985) (characterizing Miller Act as "Federal equivalent of New Jersey's Bond Act"). Moreover, the Supreme Court of New Jersey has had the occasion to opine on the Miller Act as "remedial legislation" which should be construed primarily to effectuate the end of "protection of laborers and materialmen who aid in performance of construction contracts for public work." Minneapolis-Honeywell Regulator Co. v. Terminal Construction Corp., 41 N.J. 500 (1964). Bearing these concepts in mind, it is clear that this Court's interpretation of the Bond

Act should look to federal cases interpreting the Miller Act, which New Jersey courts recognize as protective legislation, in order to provide greater protection for laborers and materialmen.

Not having addressed the Miller Act line of cases, the Sureties urge the Court to adopt the decision in Titan Stone, Tile & Masonry, Inc. v. Hunt Construction Group, Inc., No. 05-3362, 2007 WL 869556 (D.N.J. 2007), wherein the court held that the time restrictions set forth in the Bond Act, N.J.S.A. 2A:44-145 are clear and unambiguous, and must be applied strictly. In support of its decision, the court relied on the New Jersey Appellate Division decision, Samuel Braen's Sons v. Fondo, 52 N.J. Super. 188, 192 (App. Div. 1958), for the proposition that the time requirements of the Bond Act require strict compliance. Although the Titan Stone case dealt with the same College of New Jersey construction project, the Court does not find that case helpful to the arguments raised here because the opinion lacks any discussion that the Bond Act should be interpreted in light of the Miller Act, and particularly because, in 1996, N.J.S.A. 2A:44-145 was amended by the New Jersey Legislature to conform to the changes Congress made when it replaced the Heard Act with the Miller Act.[4] Indeed, Samuel Braen was decided before the amendments were made to the Bond Act. As such, the Titan Stone case does not reflect the remedial goals of the amended Bond Act. More importantly, it does not take into account the long standing line of cases in New Jersey that have adopted the Miller Act as a

---

[4.] The Heard Act, the Act of August 13, 1894, 28 Stat. 278, as amended by the Act of February 24, 1905, 33 Stat. 811, preceded the Miller Act and strongly protected the interests of the government. See United States ex rel. Texas Portland Cement Co. v. McCord, 233 U.S. 157, 163-64 (1911). See also Haydis, 338 F.2d at 446-47 (explaining the differences between the Heard Act and the Miller Act). When the Miller Act replaced the Heard Act, the courts recognized that its overriding purpose was to protect subcontractors and suppliers on government projects. F.D. Rich Co. v. Indus. Lumber Co., 417 U.S. 116, 122 (1974). This change in emphasis has led the courts to interpret the Miller Act liberally to protect the interests of subcontractors and suppliers. United States ex rel. E&H Steel Corp. v. C. Pyramid Enters., Inc., 509 F.3d 184, 186 (3rd Cir. 2007).

guidepost for construing the Bond Act.  See Dial Block, 374 N.J. Super. at 20.

In addition to their reliance on Titan Stone, the Sureties implore the Court to reject the policy of the Miller Act as instructive in this case; rather, they argue, the plain language of the Bond Act should prevail.  They reason that the purpose of a statute cannot trump the statute's plain language.  To do so here would nullify the 90-day waiting period.  N.J.S.A. 2A:44-145 states in relevant part: "No action shall be brought against any of the sureties on the bond required by this article until the expiration of 90 days after provision to the sureties and the contractor of the statement of amount due to him, but in no event later than one year from the last date upon which such beneficiary shall have performed actual work or delivered materials to the project."  Id.  In essence, this provision not only precludes premature filings but also acts as a statute of limitations.  Here, Quinn filed prematurely under N.J.S.A. 2A:44-145 and therefore, the plain language of the statute would warrant dismissal of its claims.  If the Sureties had moved to dismiss within the one-year statute of limitations, Quinn would presumably have re-filed its claims after the statutory 90-day waiting period.  However, the Sureties are also invoking the statute of limitations as a bar to Quinn's ability to re-file.  Accordingly, the Sureties' reliance is not solely on the 90-day waiting period but also on the one-year statute of limitations.

After the 1996 amendments to the Bond Act, New Jersey courts have dealt little, if at all, with the Act's waiting period and statute of limitations.  As this issue is one of first impression in New Jersey, i.e., whether time limitations in the Bond Act should be construed liberally when equitable circumstance exists, the Court's task is to predict how the New Jersey Supreme Court would decide this matter.  Covington v. Continental Gen. Tire, Inc., 381 F.3d 216, 218 (3d Cir. 2004)(in carrying out that task, this Court must consider relevant state precedents, analogous

decisions and considered dicta tending convincingly to show how the highest court in the state would decide the issue at hand).

In the context of statutes of limitations, the New Jersey Supreme Court is forgiving when neceesary to effectuate the intent and purpose of a statute. For example, the New Jersey Supreme Court in Giacobbe v. Gassert, 29 N.J. 421 (1959), reversed the appellate court's decision to bar plaintiff's automobile accident claim because he failed to submit his claim to the New Jersey Division of Motor Vehicles within 90 days pursuant to N.J.S.A. 39:6-65. In so doing, the Court elaborated on the following principle of statutory interpretation with respect to time limitations:

> It is the obvious reason of a law that gives it life, not the strict, literal sense of terms. The words may be expanded or limited according to the spirit of the legislative expression. The animating principle of the correlated symbols of expression prevails over the import of particular words and phrases, considered in vacuo or in the context of other and different circumstances. The whole is to be coordinated in fulfillment of the overriding plan and purpose; the procedural course is not an end in itself but a mechanism in aid of the substantive policy.

Id. at 425. In other words, statutory limitations periods ought not to be so rigidly enforced as to run counter to the purpose of the law. Indeed, often the circumstances of a given case necessitate a court to toll the limitations period in the interest of justice. In that regard, the basic question that a court must ask in determining where a statute of limitations is to be tolled is whether a statute's underlying policies and remedial scheme are served by tolling a limitations period under certain circumstances. White v. Violent Crimes Compensation Bd., 76 N.J. 368, 377 (1978). Thus, the "application of equitable principles to a substantive statute of limitations depends on statutory interpretation focusing on legislative intent and purpose." R.A.C. v. P.J.S., Jr., 192 N.J.

81, 100 (2007).

This type of equitable relief has been reaffirmed by the New Jersey Supreme Court in Price v. N.J. Mfrs. Ins. Co., 182 N.J. 519 (2005).  There, the Court found that equitable considerations supported tolling time limitations where the actions of the defendant insurance company "lulled plaintiff and his counsel into believing that the uninsured motorist claim had been properly filed." Id. at 527.  In particular, that plaintiff's attorney wrote to plaintiff's insurance company, asserting that he would like to establish a claim file and that he would like proceed with his claim. The insurance company investigated his claim for several years before denying it based on his failure to file a proper complaint within the appropriate time period.  The Court held that it was not reasonable for the insurance company to sit back, request and receive various documents over a three-and-a-half year period, and then deny the claim because the plaintiff failed to file a complaint.  Id.  Under the facts of that case, the insurance company was estopped from raising the statute of limitations defense and that it should have notified plaintiff of its intent to rely on the statute of limitations.  Id. at 523-24.  Importantly, the Court noted "[t]he primary purpose of the statute of limitations is to provide defendants a fair opportunity to defend and to prevent plaintiffs from litigating stale claims." W.V. Pangborne & Co., Inc. v. New Jersey Dep't of Transp., 116 N.J. (1989) (citing Ochs v. Fed. Ins. Co., 90 N.J. 108, 112 (1982)); O'Keeffe v. Snyder, 83 N.J. 478, 490-91 (1980)). Consistent with that purpose, "where defendants are on notice of the claims, and no significant prejudice results, the policy reasons for upholding a strict statute of limitations recede." Price, 182 N.J. at 524 (citations omitted).

Here, the decisions of the Miller Act cases together with New Jersey Supreme Court cases tolling time limitations are persuasive.  Recognizing the broad protection the Bond Act affords

Quinn, it would be inequitable under the circumstances of this case to dismiss Quinn's claims because of a procedural defect - a defense that should have been raised earlier in this litigation. There is no dispute that Quinn filed five days before the 90-day waiting period proscribed under the Bond Act.  However, it took the Sureties over two-and-a- half years to move for summary judgment on this issue, and after the one year statute of limitation for Quinn to bring its claims against the Sureties had run.  The Sureties claim that their motion was timely filed the day after Quinn produced its notice of claim letters in discovery - two years after the Sureties requested them.  Certainly, however, the Sureties knew or should have known of the existence of this defense since they raised it in their Answers and they were the receipients of the claims notices. Yet, they chose to not move for relief until substantial discovery had been conducted by all parties.[5]  More importantly, although the Sureties asserted an Affirmative Defense that Quinn's claims are "time-barred" in their Answers, nowhere do the Sureties cite to any statutory provision that would have placed Quinn on notice that the Sureties were relying on the Bond Act's waiting period as a defense.  Since there is no statutory reference, the boiler plate langauge of the defense could have applied to other time limitations unrelated to the Bond Act.  The lack of notice of the defense and the substantial delay in moving for relief are deserving of equitable tolling, similar to what the New Jersey Supreme Court held in Price.

Further, the Sureties have not pointed to any prejudice they would suffer if the time period were tolled, and moreover having reviewed the record, the Court does not find the

---

[4.] Curiously, although the Sureties explained that they could not have filed this motion until Quinn produced the claims notices two years after their discovery requests, the claims notices were sent to each of the Sureties before this suit was brought; this presumably formed the basis of the Sureties' Affirmative Defense at the inception of this suit.  Indeed, the Sureties do not dispute that they received the notice letters and confirmed that they in fact received the notices on November 8, 2005. See Patterson's Declaration, ¶ 3.

Sureties will be prejudiced. Rather, the prejudice would be greater to Quinn since Quinn has been pursuing its claims against the Sureties for more than two years. "It is too late in the day and entirely contrary to the spirit of Federal Rules of Civil Procedures for decisions on the merits to be avoided on the basis of such mere technicalities." Haydis, 338 F.2d at 448 (quoting Foman v. Davis, 371 U.S. 178, 181-82 (1962). To that end, the Rules reject the approach that pleading is a "game of skill" in which one mistake by counsel may be decisive to the outcome and engender the principle that "the purpose of pleading is to facilitate a proper decision on the merits." Id.

The Sureties would have the Court ignore the principle espoused in these decisions and those handed down by the State's highest court and simply enforce the waiting period and statute of limitations to bar Quinn's claims without regard to the underlying policies of the Bond Act. While the waiting period and statute of limitations promote an important aspect of the Act, they are not without exceptions. Under the circumstances of this case, there is no prejudice to the Sureties and a substantial amount of time has elapsed - especially since the parties have already spent significant resources litigating for over two-and-a-half years - it is in the interest of equity to toll the time limitations in order for Quinn to proceed with its claims. This result is consisent with the protective nature of the Bond Act, as interpreted through the lens of the Miller Act, and the New Jersey Supreme Court's liberal construction of time contraints within protective statutes. Without affording such cure, Quinn would be forever barred from bringing its claims based upon time limitations in a statute intended to protect parties such as Quinn.

For the reasons set forth herein, the Sureties' Summary Judgment Motion is denied.

DATED:  June 29, 2009                                                  /s/ Freda L. Wolfson
                                                                                                     The Honorable Freda L. Wolfson
                                                                                                     United States District Judge